## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| LOU ANN MURPHY,<br>265 Llwyds Lane,<br>Vero Beach, Florida 32963<br>Individually and On Behalf of All<br>Others Similarly Situated,<br><br>                              Plaintiff,<br>    v.<br><br>XM SATELLITE RADIO HOLDINGS INC.,<br>1500 Eckingon Pl.,<br>N.E., Washington, D.C.  20002,<br>and HUGH PANERO,<br>1500 Eckingon Pl.,<br>N.E. Washington, D.C. 20002,<br><br>                           Defendants. | ) Civil Action No. _____<br>)<br>)<br>)<br>)<br>) **CLASS ACTION COMPLAINT FOR**<br>) **VIOLATIONS OF FEDERAL**<br>) **SECURITIES LAW**<br>)<br>)<br>)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiff, Lou Ann Murphy, individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her Class Action Complaint, alleges the following upon personal knowledge as to herself and her own acts and upon information and belief as to all other matters, based upon the investigation made by and through her attorneys, that included, among other things, a review of the press releases, website, and other publicly available documents of XM Satellite Radio Holdings, Inc. ("XM" or the "Company"), including the Company's public filings with the United States Securities and Exchange Commission ("SEC").

## NATURE OF THE ACTION

1.    Plaintiff brings this action as a class action on behalf of herself and all other persons who purchased securities of XM during the period July 28, 2005 through and including February 15, 2006 (the "Class Period"), to recover damages caused by Defendants' violations of the federal securities laws.

2.    At all relevant times, XM operated as a satellite radio service company, providing audio entertainment and information programming for a monthly fee.  XM Satellite Radio Inc., XM's wholly owned subsidiary, transmits from satellites to homes, vehicles and portable radios. XM describes itself as one of only two companies providing satellite radio service in the United States.

3.    In XM's Form 10-Q filed with the SEC during the Class Period, the Company stated that "the key metrics we use to monitor our business growth and operational results are: ending subscribers, Average Monthly Subscription Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs ("SAC"), Cost Per Gross Addition ("CPGA") and EBIDTA." The investing market has come to rely on those metrics, particularly SAC and CPGA, as an indicator of the financial condition of companies such as XM.

4.    In press releases, SEC filings and other public statements disseminated during the Class Period, Defendants made

2

materially false and misleading statements, and/or omitted material facts necessary to make those statements not misleading concerning XM's financial results. In particular, Defendants led the market to believe that it would grow its subscriber base to six million users by year-end 2005, while at the same time lowering its SAC and CPGA.

5.    In reality, the Company was well aware that costs, specifically SAC and CPGA, were increasing, and would skyrocket in the fourth quarter of 2005 as the result of a $25 million promotional campaign to combat the debut of the popular "Howard Stern Show," on Sirius Satellite Radio, Inc., XM's primary competitor.

6.    On February 16, 2006, the Company issued a press release announcing its financial and operating results for fourth quarter 2005, and full-year 2005, ending December 31, 2005. XM reported a net loss of $268.3 million as compared to $188.2 million in the fourth quarter of 2004. For the full year 2005, XM's net loss was $666.7 million, compared to $642.4 million in 2004. In addition, the Company announced that both SAC and CPGA were much higher than it had led the market to believe.

7.    The market reacted swiftly to those revelations, sending the price of XM's common stock down 5.03% from a closing price of $25.25/share on February 15, 2006, to $23.98/share on

3

February 16, 2006, dropping a further 10.05% to $21.57/share at the close of trading on February 17, 2006.

## JURISDICTION AND VENUE

8.    The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

9.    The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

10.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein occurred in substantial part, and Defendants conduct substantial business, in this District.

11.    In connection with the acts, transactions and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

4

## PARTIES

12.   Plaintiff, Lou Ann Murphy, purchased shares of XM's common stock during the Class Period, as set forth in the attached certification, and was damaged thereby.

13.   Defendant XM is incorporated under Delaware laws, and maintains its principal executive offices at 1500 Eckington Place NE, Washington, DC 20002-2194. Throughout the Class Period, XM's common stock traded on the NASDAQ under the symbol "XMSR."

14.   Defendant Hugh Panero ("Panero") has served as XM's President, Chief Executive Officer ("CEO") and a member of the Board of Directors since 1998.

15.   By reason of his position with the Company, Panero had access to internal documents, reports and other information, including adverse non-public information concerning the Company's business and financial condition, and attended management meetings and/or meetings of the Board of Directors. As a result of the foregoing, Panero was responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

16.   Panero, as an officer and director of a publicly-traded company, had a duty to disseminate truthful and accurate information with respect to the Company, and a duty to correct any public statements issued by or on behalf of the Company that had become false and misleading.

5

17. Panero knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's securities and would artificially inflate the price of the Company's securities. Panero acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiff and the other Class members.

18. As an officer and a controlling person of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and were and are traded on the NASDAQ and governed by the provisions of the federal securities laws, Panero had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

19. Panero's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20. Panero, because of his position with the Company, controlled and/or possessed the authority to control the contents

6

of its reports, press releases and presentations to securities analysts and, through them, to the investing public. Panero was provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Panero had the opportunity to commit the fraudulent acts alleged herein. Panero is liable, jointly and severally, as a direct participant in and co-conspirator of the wrongs complained of herein.

## **CLASS ACTION ALLEGATIONS**

21.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of XM during the Class Period, and who suffered damages thereby.

22.  Excluded from the Class are Defendants, members of Defendants' families, any entity in which any Defendant has a controlling interest or is a parent or subsidiary of, or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of any Defendant.

23.  The Class members are so numerous that joinder of them all is impracticable. Although the exact number of Class

7

members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, hundreds of Class members who traded during the Class Period. Record owners and other Class members may be identified from records maintained by XM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual class members. Among the questions of law and fact common to the class are whether:

(a) Defendants violated the federal securities laws acts as alleged herein;

(b) the Company issued false and misleading statements during the Class Period;

(c) Panero caused the Company to issue false and misleading statements during the Class Period;

(d) Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e) the market price of the Company's securities during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

8

(f)    the Class members have sustained damages and, if so, what is the proper measure of damages.

25.    Plaintiff's claims are typical of those of the Class members in that Plaintiff and Class members sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

26.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

27. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, because joinder of all Class members is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members to redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Materially False And Misleading Statements
### Issued During The Class Period

28.   Throughout the Class Period, defendants knowingly
made materially false and misleading statements, and/or omitted
material facts necessary to make those statements not misleading,
in press releases, SEC filings, analyst conference calls, and other
public statements. Those public statements misrepresented the
Company's ability to reduce its costs for adding new subscribers
while meeting its stated goal of growing its subscriber base to 6
million by year-end 2005.

29.   On July 28, 2005, XM issued a press release
announcing the Company's financial results for the reporting period
ended June 30, 2005 ("July 28, 2005 Press Release"). The July 28,
2005 Press Release reported second quarter revenues in the amount
of $125 million, a 136% increase over the $53 million reported in
the second quarter of 2004. That revenue growth was attributed to
a net increase of 647,226 subscribers for the second quarter of
2005, bringing XM's total subscriber base to 4,417,490. The Company
also reported improved SAC and CPGA over the prior-year period. On
the basis of the Company's first half performance and "an even
stronger outlook for the second half," XM increased its subscriber

10

guidance from 5.5 million to 6 million subscribers by year-end 2005.

30.  On July 28, 2005, XM also held a conference call with investors concerning the Company's second quarter 2005 earnings ("2Q'05 Conference Call"). During that conference call, Defendant Panero trumpeted the Company's second quarter growth in revenue and subscribers, placing particular emphasis on lower subscriber addition costs:

> Although we are quite pleased with the progress of our revenue growth, the more important long-term question is what did it cost to generate this increase of 136%. On this front, the news is also good. XM's fully loaded per unit cost of capturing a new subscriber, or CPGA, was $98 for the second quarter of 2005, an improvement of 3% from the [$]101 CPGA reported a year ago. Subscriber acquisition costs, or SAC, a component of CPGA, were $50 per gross connect for the second quarter of 2005, improving 12% from $57 a year ago.

XM's CFO, Joe Euteneuer ("Euteneuer"), added that the Company "expect[s] CPGA to remain stable during the second half of the year."

31.  On August 5, 2005, the Company filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2005 ("Q2'05 10-Q"), signed by Defendant Panero and reaffirming the Company's financial results announced in its July 28, 2005 Press Release. In addition, Defendant Panero signed the requisite certifications under 18 U.S.C. § 1350 and § 302 of the Sarbanes-

11

Oxley Act of 2002 ("SOX") attesting to the accuracy of the
financial statements and other representations contained in the
Q2'05 10-Q. In the filing, the Company stated that "[t]he key
metrics we use to monitor our business growth and our operational
results are: ending subscribers, Average Monthly Subscription
Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs
("SAC"), Cost Per Gross Addition ("CPGA") and EBITDA." In addition,
the Company made the following representations:

> The timing of promotions and new contracts may cause SAC
> to fluctuate from period to period. **We expect SAC to
> decline in 2005 as compared to 2004.**

> [A] change in the mix of subscribers from higher cost
> distribution channels to lower cost distribution channels
> will have a favorable impact on CPGA. **We expect CPGA to
> decline in 2005 as compared to 2004.**

(Emphasis added).

32. On October 27, 2005, XM issued a press release
announcing the Company's financial results for the reporting period
ended September 30, 2005 ("October 27, 2005 Press Release"),
touting record revenue and subscriber additions, and reiterating
its guidance of growing its subscriber base to over 6 million by
year-end 2005. The Company emphasized the reduction in costs for
adding new subscribers as reflected in SAC and CPGA as key factors
in its record revenue growth, and stated its expectation of
additional revenue growth through the fourth quarter:

12

**Record Revenue from Cost-Effective Subscriber Growth**

> For the quarter, XM reported revenue of $153 million, an
> increase of 134 percent over the $65 million reported in
> the third quarter 2004. ***** Subscriber Acquisition
> Costs (SAC) in the third quarter 2005 were $53, a
> decrease from the $57 in the third quarter 2004. Cost Per
> Gross Addition (CPGA) in the third quarters of both 2005
> and 2004 was $89. XM products are well stocked for the
> holiday season and XM expects to accelerate its
> subscriber and revenue growth through the fourth quarter.

33.   On October 27, 2005, XM also held a conference call
with investors concerning the Company's third quarter 2005 earnings
("3Q'05 Conference Call"). During that conference call, Defendant
Panero again placed particular emphasis on low subscriber addition
costs, attributing the Company's record revenues for the period to
"smart subscriber growth" that "demonstrated XM's ability to
deliver dramatically-increasing subscriber and revenue growth with
the lowest subscriber acquisition cost, or SAC, in the industry."
Panero elaborated:

> The secret to XM's smart subscriber growth rather than
> growth at any cost is the ability to control marketing
> and product expenses while rapidly growing subscribers.
> This quarter, XM kept its fully loaded per-unit costs of
> capturing a new subscriber, or CPGA, constant at $89 -
> the same CPGA we reported in the third quarter last year.

In addition, during the call, Euteneuer touted the Company's
"efficient sales and marketing efforts," noting the decline in SAC
and CPGA over the second quarter 2005, and reaffirmed the Company's
guidance of 6 million net subscribers by year-end 2005.

13

34. On November 1, 2005, XM issued a press release announcing a net addition of 305,284 retail subscribers during the third quarter of 2005 that brought its market share to 59%, a 3% increase over the previous quarter ("November 1, 2005 Press Release"). The November 1, 2005 Press Release quoted Defendant Panero as stating that: "XM continues to expand its leadership position while adding subscribers at about one-third the cost of our competitor."

35. On November 7, 2005, the Company filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2005 ("Q3'05 10-Q"), signed by Defendant Panero and reaffirming the Company's financial results announced in its October 27, 2005 Press Release. Defendant Panero also signed the requisite certifications under SOX attesting to the accuracy of the financial statements and other representations contained in the filing. Regarding its subscriber addition costs as reflected by SAC and CPGA, the Company stated:

SAC for the three months ended September 30, 2005 and 2004 was $53 and $57 [per subscriber], respectively. The decline in SAC for the three month period ended September 30, 2005 as compared to the three month period ended 2004 is due to the combined impacts of the decline in manufacturer subsidies and the increase in the number of activations. The timing of promotions and new contracts may cause SAC to fluctuate from period to period. CPGA for the three month periods ended September 30, 2005 and 2004 was $89 [per subscriber]. The timing of our media campaigns and discretionary advertising spending

14

> may cause CPGA to fluctuate from period to period. The
> costs to acquire subscribers vary by distribution
> channel, and a change in the mix of subscribers from
> higher cost distribution channels to lower cost
> distribution channels will have a favorable impact on
> CPGA. The timing of promotions and new contracts may
> cause CPGA to fluctuate from period to period.

Defendants again reported among the "highlights" of the period that
the Company "continues] to grow [its] subscription margin ... while
reducing [its] Subscriber acquisition costs," noting that SAC and
CPGA (along with ARPU and EBITDA) are "[t]he key metrics we use to
monitor our business growth and our operational results."

36.     Defendants knowingly failed to report in any of the
foregoing and other public statements, press releases, SEC filings,
or analyst conference calls their plans to dramatically increase
advertising and marketing expenses in response to the fourth
quarter debut of Howard Stern's radio show on Sirius Satellite
Radio, XM's primary competitor. Those massive and entirely planned
promotional expenses caused the Company's SAC and CPGA to skyrocket
in the final quarter of 2005, ultimately resulting in a huge
reduction in the price of XM securities when Defendants revealed
them to the market.

## The Truth Emerges

37.     On February 16, 2006, the Company issued a press
release ("February 16, 2006 Press Release") announcing its
financial and operating results for fourth quarter and the full

15

year ended December 31, 2005. XM reported a net loss for fourth quarter 2005 of $268.3 million as compared to one of $188.2 million in the fourth quarter of 2004. For the full year 2005, XM's reported net loss was $666.7 million, compared to a net loss of $642.4 million in 2004. The Company further reported an 84% increase in subscriptions over 2004, bringing its net subscriber base to 5,932,957 - nearly meeting its guidance for year-end 2005 of over 6 million subscribers. The Company also revealed an enormous increase in subscriber addition costs, providing the following explanation:

> For the fourth quarter, subscriber acquisition cost (SAC), a component of cost per gross addition (CPGA) was $89 compared to $64 in the same period last year. CPGA in the fourth quarter was $141 compared to $104 in the same period last year. These increases were primarily due to higher marketing expenses to meet a one-time competitive event in the fourth quarter. For full year 2005, SAC was $64, a slight increase from $62 in 2004, and CPGA was $109, compared to $100 in 2004.

> The increase in CPGA is due primarily to the fourth quarter of 2005 increase in SAC, and the substantial one-time increase in discretionary advertising and marketing expenses, primarily media, in response to our competitor's launch of Howard Stern.

38. Also on February 16, 2006, the Company disclosed in a Form 8-K filing with the SEC that Director Pierce J. Roberts, Jr., had submitted a letter of resignation to the Company on February 13, 2006, stating that:

16

I have been troubled about the current direction of the company and do not believe that it is in the best interest of the company's shareholders. For some time I have made my analyses and observations known in an increasingly vociferous manner to the Board and a number of senior managers of the Company. I am not having any useful effect and I care too much and believe in my own views too much to just "go along."

Given current course and speed there is, in my view, a significant chance of a crisis on the horizon. Even absent a crisis, I believe that XM will inevitably serve its shareholders poorly without major changes now. It is clear to me that I cannot be part of the solution and I will not be part of the problem.

39.   In the February 16, 2006 Form 8-K, the Company

disclosed the specific disagreements that Mr. Roberts had with the

direction of the Company:

Although the letter does not explicitly state the nature of the disagreement, the Company believes the disagreement with Director Roberts primarily involves the strategic balance of growth versus cash flow. Director Roberts has historically favored more stringent cost control in the Company, specifically involving lower marketing, programming and promotional expenditures. While Director Roberts believed that expenses could be lowered without jeopardizing subscriber and revenue growth and/or market share, he was prepared to risk growth or market share impacts if they resulted, with the belief that positive cash generation would occur sooner, and the Company's stock would be valued more highly as a smaller, but more profitable enterprise.

40.   The revelations contained in the Company's February

16, 2005 SEC filing and attendant press release shocked the market.

As a direct and proximate result of the disclosures contained

therein, the price of XM's stock fell 5.03% from a closing price of

17

$25.25/share on February 15, 2006, to close at $23.98/share on February 16, 2006, and then dropped another 10.05% to close at $21.57/share on February 17, 2006. Both of those drops occurred during unusually heavy trading volume of over 30 million shares.

41. Plaintiff, and the other Class members, suffered losses as a direct and proximate result of Defendants' wrongful conduct, the artificial inflation of the price of XM's securities during the Class Period and the subsequent drop in the price of those securities when the truth was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

42. As alleged herein, Defendants acted with scienter in that they knew that statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth in detail in this Complaint, Defendants participated in the fraudulent scheme alleged herein by virtue of: (1) their receipt of information reflecting the true facts regarding the Company; and (2) their control over, and/or associations with, the Company, which made them privy to confidential proprietary information concerning the Company.

18

43. Panero also was motivated to commit the fraud alleged herein. In particular, he earned substantial compensation at the Company, and had substantial holdings of Company securities that motivated him to engage in practices aimed at inflating the Company's stock price. In addition to his compensation packages, Panero and other insiders engaged in significant and highly suspicious insider stock sales during the Class Period.

44. During the fourth quarter of 2005, Panero sold approximately 413,334 shares, or 98.71%, of his personally-held XM stock, reaping proceeds of approximately $8,841,000.

45. During the fourth quarter of 2005, Executive Vice President Stephen Cook sold approximately 78,514 shares, or 57.19%, of his personally-held XM stock, reaping proceeds of approximately $1,596,000.

46. During the fourth quarter of 2005, Director George Haywood sold approximately 2,070,640 shares, or 71.99%, of his personally-held XM stock, reaping proceeds of approximately $58,847,000.

47. During the fourth quarter of 2005, Executive Vice President Stelios Patsiokas sold approximately 103,514 shares, or 61.90%, of his personally-held XM stock, reaping proceeds of approximately $1,873,000.

48.    During the fourth quarter of 2005, Executive Vice President/General Counsel Joseph Titlebaum sold approximately 103,514 shares, or 65.61%, of his personally-held XM stock, reaping proceeds of approximately $2,167,000.

49.    Collectively, Company insiders sold approximately 2,769,516 shares of personally-held XM stock, all during the fourth quarter of 2005, reaping proceeds of approximately $73,325,000.

## FRAUD-ON-THE-MARKET PRESUMPTION

50.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts regarding the Company's business and financial condition during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's common stock is traded on the NASDAQ stock exchange and trades in an efficient and open market;

(d)    The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)    Plaintiff and the Class members purchased their securities between the time Defendants failed to disclose or

20

misrepresented material facts and the time the true facts were disclosed, without knowledge of the misrepresented facts; and

(f) XM is followed by various analysts and news media. At all relevant times, the price of XM's securities reflected the effect of news disseminated in the market.

51. Based on the foregoing, Plaintiff and the Class members are entitled to the presumption of reliance upon the integrity of the market.

## LOSS CAUSATION

52. Defendants' false and misleading statements had the intended effect and caused the Company's securities to trade at artificially inflated levels throughout the Class Period, reaching a high of $36.93/share on July 28, 2005.

53. The decline in the value of the Company's securities at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the value of the Company's securities negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts, unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by the Plaintiff and other Class members was a direct result of

Defendants' fraudulent scheme to artificially inflate the value of the Company's securities, and the subsequent significant decline in that value when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

## THE SAFE HARBOR PROVISION IS INAPPLICABLE

54. The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-

looking statement was authorized and/or approved by an executive officer of XM who knew that those statements were false when they were made.

## COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

55. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56. This Count is asserted against all Defendants and is based upon Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

57. During the Class Period, Defendants, singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly and recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the other Class members, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other Class members. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce

Plaintiff and the other Class members to purchase XM's securities during the Class Period at artificially inflated prices.

58. Throughout the Class Period, XM acted through Panero, whom it portrayed and represented to the financial press and public as its valid representative. The willfulness, motive, knowledge, and recklessness of Panero therefore are imputed to XM, which is primarily liable for the securities law violations by Panero.

59. As a result of the failure to disclose material facts, the information Defendants disseminated to the investing public was materially false and misleading as set forth above and the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the duty to disclose the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiff and the other Class members relied in purchasing XM securities, to their detriment, on the integrity of their market price. Had Plaintiff and the other Class members known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices they paid.

24

60. Plaintiff and the other Class members have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

61. By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon Plaintiff and the other Class members in connection with their purchases of XM's securities during the Class Period.

COUNT II

VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

62. Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

63. Panero, by virtue of his position, and/or specific acts described above, was, at the time of the wrongs alleged herein, a controlling person within the meaning of Section 20(a) of the Exchange Act.

64. Panero had the power and influence and exercised the same to cause XM to engage in the illegal conduct and practices complained of herein.

25

65.   By reason of the conduct alleged in Count I of the Complaint, Panero is liable jointly and severally and to the same extent as the Company for the aforesaid wrongful conduct, and is liable to Plaintiff and to the other Class members for the substantial damages that they suffered in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff, on her own behalf and on behalf of the Class, prays for judgment as follows:

(a)   Determining that this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c)   Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs attorneys and experts;

(d)   Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder; and

(e)   Granting such other and further relief as the Court may deem just and proper.

26

## **JURY TRIAL DEMANDED**

Plaintiff demands a jury trial of all issues so triable

Date:   May 12, 2006

Respectfully submitted,

COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.

Steven J. Toll (DC Bar No. 225623)
Daniel S. Sommers (DC Bar No. 416549)
Joseph Helm
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005-3934
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

WECHSLER HARWOOD LLP
Samuel K. Rosen
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

27